Burton Swartz Land Corporation, a Louisiana Corporation v. Commissioner.
Burton Swartz Land Corp. v. Commissioner
Docket No. 21550.
United States Tax Court
1951 Tax Ct. Memo LEXIS 344; 10 T.C.M. (CCH) 92; T.C.M. (RIA) 51028; January 25, 1951
Edward McCarthy, Esq., for the petitioner. Bernard D. Hathcock, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent has determined deficiencies and asserted penalties for failure to file personal holding company returns, as follows: Personal
Income Tax
Excess Profits
Holding Co.
Year
Deficiency
Tax Deficiency
Surtax Deficiency
Penalty
1944
$ 4,092.64
$1,023.16
1945
$1,282.55
$ 2.48
6,834.97
1,708.74
1946
10,377.20
2,594.30
*345 Petitioner's contest of the deficiencies in income and excess profits tax presents only the question whether respondent erred in disallowing a deduction for interest. Petitioner does not contest the deficiencies in personal holding company surtax, but challenges the penalties. Findings of Fact Petitioner, a Louisiana corporation, filed its returns for the calendar years in question with the collector for the district of Louisiana. Facts Relating to Interest Deduction When organized in 1937, in consideration for 985 of its 1000 shares of capital stock, petitioner acquired timber lands from Burton-Swartz Cypress Company, hereinafter called the Cypress Company, According to minutes of a meeting of petitioner's board of directors on September 13, 1946, petitioner "ought, at the same time [that it acquired the timber lands], to have assumed" certain indebtedness of the Cypress Company "but through oversight did not formally do so." The minutes recite that petitioner effectively assumed the indebtedness on December 31, 1937, in the amount of $88,623.85 with "accrued interest on all said advances * * * from their respective dates to December 31, 1937" of $33,269.71; and that *346 the indebtedness had increased to $95,062.10 by 1945, with interest at 5 per cent per annum. The indebtedness in question was all owed to The Atlantic National Bank of Jacksonville, hereinafter called Atlantic Bank, as trustee. Prior to December 15, 1945, petitioner made no interest payments. A check bearing that date was drawn by petitioner and signed by its treasurer, in the amount of $15,000 payable to the order of Atlantic Bank. The check's stub recorded the $15,000 to be a "payment on account of accumulated interest on indebtedness to Burton Trust." The beneficiaries of Burton Trust, of which Atlantic Bank served as trustee, were William and Mabel Burton who received 60 and 40 per cent of the trust's income, respectively. Atlantic Bank recorded the $15,000 payment in its ledger with the explanation: "Payment on account of accumulated interest from accounts receivable from Burton Swartz Land Corporation," and filed a separate 1945 fiduciary return for each of the beneficiaries, reporting as income their proportionate shares of the $15,000. Petitioner keeps its books and prepares its returns on an accrual basis of accounting. As disclosed by the minutes of the meeting of petitioner's *347 board of directors held on September 13, 1946, and by a memorandum dated September 6, 1946, prepared by petitioner's auditor for inspection at the meeting, petitioner's books did not include accounts showing its debt to Atlantic Bank or the accrued interest thereon. The memorandum states, in part: "* * * Some time after the filing of corporation's [petitioner's] original income tax return for calendar year 1944, it was discovered that an error was made in classifying as income from rents receipts * * * which were in reality, oil royalties. * * * An amended return has been filed, * * *. "Subsequent to the filing of this amended return and claim for refund, decision was reached to bring on to the books of account a liability of the predecessor corporation to the Trustees under the will of Katharine E. Burton which had been inadvertently omitted from the opening entries and to accumulate interest on this indebtedness at the rate of 5% per annum. This interest charge for the calendar year 1944 amounted to $4,753.11." The memorandum referred to a conference "several days ago" which had included petitioner's president and auditor; and stated that mentioned conference, according to *348 my understanding, were as follows: (a) The net assets of the * * * Cypress Company * * * turned over to [petitioner] * * * are to be capitalized by being credited to paid-in surplus instead of being credited to the stockholders in open account, the treatment accorded them when the books of account in the land corporation [petitioner] were opened. * * * (b) That the indebtedness of the Cypress Company to the Burton Estate, Inc. be set up on the books of the land corporation [petitioner] and a credit to Burton Estate, Inc. in open account. * * * (c) That interest at the rate of 5% per annum on the indebtedness referred to in item (b), above, from May 7, 1927 to and including December 31, 1937 be shown on the books of the land corporation [petitioner] by a charge to deferred charges with the offsetting credit to accrued interest. * * * (d) That interest at the rate of 5% per annum on the indebtedness * * * from January 1, 1938 to December 31, 1944 be charged to the surplus account and credited to accrued interest. * * *" The memorandum advised that "journal entries should be authorized by a resolution of the Board of Directors." The minutes of the September 13, 1946 meeting *349 recite that as of December 31, 1945, accrued interest on the indebtedness in question amounted to $55,116.57 "after allowing against accrued interest the sum of $15,000.00 paid in 1945." The failure of petitioner's books, and those of the Cypress Company, "to show precisely and explicitly from year to year the amount of these advances," was stated to have been apparently "a bookkeeping oversight, not affecting the substantial rights of any party or parties." A resolution adopted at the same meeting "authorized and instructed" petitioner's officers to - "* * * cause the books of this corporation to be so amended as to show as liabilities on the balance sheet for December 31, 1945 'Accounts Payable' in the total amount of $96,053.85 [being the $95,062.10 in question plus other items] and 'Accrued Interest' in the total amount of $55,116.57, which liabilities are hereby acknowledged, ratified, and confirmed as correct and valid liabilities of this corporation as of December 31, 1945 * * *." Neither the auditor's memorandum nor the minutes of the September 13, 1946 meeting mention a recommendation concerning treatment of the $15,000 interest payment in question. The memorandum had *350 proposed that the following two journal entries be made: Debit
Credit
Deferred charges
$33,269.71
Accrued interest A/c #1 (5/7/27-8/1/28)
$ 3,461.11
Accrued interest A/c #2 (8/1/28-12/31/37)
29,808.60
Accrued interest to 12/31/37 on principal balance * * *, at 5% per
annum per mutual agreement of stockholders
Surplus
32,093.75
Accrued interest, A/c #3 - Current
32,093.75
To set up interest 1/1/38 to 12/31/44
The auditor's memorandum included a balance sheet of petitioner as of December 31, 1945, in which "Accrued Interest" was recorded as a liability of $55,116.57; and a "Statement of Income and Expenses Year Ended December 31, 1945," listing "Interest" expense of $4,753.11. Under date of December 15 petitioner's books show a debit of $15,000 and a credit of $29,808.60 to the accrued interest A/c #2, which was the account representing interest on the indebtedness in question accrued between 8/1/28 and 12/1/37. The $15,000 interest payment was applied on petitioner's books against interest which accrued for the period August 1, 1928, to December 1, 1937. In an original corporation income and declared value excess-profits tax return *351 for 1945 petitioner claimed a deduction for "Interest" of $4,850.77. It has filed an amended return in which the deduction is reduced to $4,753.11. In his notice of deficiency respondent disallowed the deduction with the explanation. - "To disallow interest deduction under Section 24(c) of the Internal Revenue Code." Facts Relating to Penalty Prior to 1944 petitioner's income was chiefly from rents. Its principal asset is 15,000 acres of land in Louisiana. Because oil was discovered on the land petitioner began to receive royalties in 1944. In that year's return it reported income from rents of $8,427.78 and from royalties of $4,025.17; in 1945, rents of $1,089.66 and royalties of $17,288.46; and in 1946, rents of $1,272.08 and royalties of $29,087.12. During the years in question 895 5/6 of petitioner's 1,000 outstanding shares of stock were owned by Atlantic Bank, as trustee, and the remaining 104 1/6 shares were owned by A. G. Swartz and his daughter. G. W. Frazier was president of petitioner and vice president and trust officer of Atlantic Bank. Petitioner's secretary and treasurer, R. C. Wager, was assistant trust officer of Atlantic Bank. The *352 bank's trust department prepares estate tax and fiduciary income tax returns, and retained Charles H. Goodrich, a certified public accountant to keep petitioner's books and prepare its corporate returns. Goodrich has been engaged in accounting work since 1920, is admitted to the practice before the Treasury Department and prepared about 180 individual and corporate income tax returns during 1945. There is no indication that Goodrich, Frazier, or any other person conducted any research into the problem of whether petitioner was required to file personal holding company returns for the years in question. In April 1947, subsequent to the filing of petitioner's income tax return for 1946, Frazier was contacted by an attorney for Atlantic Bank who suggested that Frazier seek an opinion from Goodrich concerning petitioner's status as a personal holding company. Acting on this suggestion Frazier asked Goodrich but received the answer that petitioner was not a personal holding company because of the nature of its income. However, the bank's attorney was insistent, and in June 1947, Goodrich admitted that petitioner should have filed personal holding company returns for each of the years *353 in question. The information disclosed by petitioner in its income tax returns for 1944, 1945, and 1946 was not sufficient to suggest that petitioner was a personal holding company. Goodrich was not in possession of all information necessary to determine whether petitioner was a personal holding company. In answer to the question whether it was "a personal holding company within the meaning of section 501 of the Internal Revenue Code," petitioner replied "no" in its corporation income and declared value excess profits tax returns (Form 1120) for 1944 and 1946; and no answer was given to that question on the return for 1945. The question whether "any corporation, individual, partnership, trust, or association" owned "50 per cent or more of the corporation's [petitioner's] voting stock" was not answered on any of the three returns. The returns required, by instructions immediately following that question, that if the "answer is 'yes,' attach separate schedule showing (1) name and address; (2) percentage of stock owned; (3) date stock was acquired; and (4) the collector's office in which the income tax return of such corporation, individual, partnership trust, *354 or association for the last taxable year was filed." None of the returns were accompanied by the required schedule. The inquiry concerning "the approximate number of stockholders at the close of the taxable year" was left unanswered in both the 1945 and 1946 returns; and was not included among the questions asked in the return for 1944. The returns on Form 1120 for 1944, 1945, and 1946 were signed by Frazier as petitioner's president and by Goodrich as "person preparing the return." Frazier and Goodrich swore to affidavits dated October 30 and November 12, 1947, respectively," regarding late filing of personal holding company tax returns, Form 1120-H." In his affidavit Frazier stated that for each of the years 1944, 1945, and 1946 Goodrich had prepared for petitioner "Form 1120 and no other"; and that petitioner had relied upon his "advice and opinion * * * so given" in failing to file Form 1120-H. Frazier's affidavit further stated that - "* * * the corporation [petitioner] is advised by said accountant that the reason for not reaching this conclusion [that Form 1120-H was required] at the time he prepared returns on Form 1120, was due to the pressure of work and shortage *355 of personnel in his office during war years. As a consequence, sufficient consideration was not given by him to the matter at that time nor to the answers to questions on Form 1120." In his affidavit, Goodrich stated in part as follows: "Prior to 1944 said corporation did not meet the income qualification as a personal holding company; and with the discovery of oil on part of its land and the beginning of the payment to said corporation of oil royalties in 1944, the corporation then became, by reason of the receipt of such royalty income, a personal holding company; but affiant overlooked the fact that the receipt of such income caused the corporation to be a personal holding company, which it had not been before. Such returns were prepared by affiant during the war years, at a time when affiant was overburdened with additional work of accountants who had gone into government service and was unable, because of the shortage of help, to obtain sufficient help, with the result that affiant was at all such times overworked, in addition to which, by reason of serious illnesses in affiant's family during such years, affiant failed to give sufficient consideration to the facts, and overlooked *356 the change of circumstances in respect of said corporation; and for these reasons, affiant failed to cause said Burton-Swartz Land Corporation to file personal holding company returns for the years 1944, 1945 and 1946." On August 15, 1947, petitioner filed personal holding company returns for 1944, 1945, and 1946. Petitioner was a personal holding company during each of those years and was required to file a return. In his notice of deficiency respondent determined that - "Inasmuch as you failed to file personal holding company returns for the taxable years ended December 31, 1944, 1945 and 1946, within the time prescribed by law, the 25% delinquency penalty has been asserted in accordance with the provisions of Section 291 of the Internal Revenue Code." Petitioner's failure to file a timely personal holding company return for each of the years 1944, 1945, and 1946, was not due to reasonable cause but was due to wilful neglect. Opinion With respect to the deduction of interest, this is a stronger case for respondent than Lincoln Storage Warehouses, 13 T.C. 33, affirmed (CA-3), 189 Fed. (2d) 337 (July 10, 1950), where a similar *357 interest deduction was disallowed. At the time the interest was paid in the Lincoln case, as here, the parties made no allocation as to whether it covered the currently accruable item or a past due obligation, and there, as here, the court determined that it should be allocated not to the current interest but to that which became an obligation in prior years. But here in addition petitioner itself adopted that application in setting the account up on its books. True, this was some months later, but, if anything, the delay indicates that the action was not hasty and could have been carefully considered. Petitioner seeks to distinguish the case on the ground that the law of Florida requires the application of the payments according to "the justice of the case." Merker v. Lake Region Packing Ass'n., 126 Fla. 589, 172 So. 702, 704. But that is no distinction because the law of New Jersey under which the Lincoln case was decided also requires a court to apply payments "'according to its own notion of the intrinsic justice of the case.' Terhune v. Colton, 12 N.J. Eq. 312, 320." Lincoln Storage Warehouses v. Commissioner, supra. We see no alternative but to sustain *358 respondent's action in this respect. On the penalty issue the question is the same as that in Tarbox Corp., 6 T.C. 35. Petitioner does not now attempt to exclude itself from the personal holding company provisions. Internal Revenue Code, section 501. It insists, however, that the failure to file a personal holding company return should not result in imposition of the delinquency penalty since its omission was due to reasonable cause and not to wilful neglect. Internal Revenue Code, section 291. As in Tarbox Corp., supra, "The reasons advanced by petitioner for its failure to file a personal holding company return either 'merely reduce themselves to a plea of ignorance of the law' * * * or amount to reliance upon an agent to whom, apparently, insufficient information was disclosed or who likewise was unfamiliar with the requirements of the taxing statute. * * * Neither is sufficient excuse." Nor are we able to distinguish this proceeding in any material respect from 1040 Springfield Avenue Corp. v. Commissioner (CA-3), 185 Fed. (2d) 406, affirming a memorandum opinion of the Tax Court [8 TCM 246,] *359 which relied upon the Tarbox case, supra. The situations are similar in that the question of the return asking whether petitioner was a personal holding company was answered "no," in two of the three returns (and unanswered in the third); that the question whether any person held more than 50 per cent of the stock was unanswered, and the schedule called for in the event of an affirmative reply was not furnished; that the liability of petition for the personal holding company tax and the requirement that a personal holding company return be filed are not now contested; that the return as filed was insufficient to suggest petitioner's liability as a personal holding company; and particularly that the evidence is inadequate to support a finding that sufficient information was disclosed to the accountant whose function it was to prepare petitioner's returns. In this respect the following is the testimony of the account: "The Court: What books did you have? "The Witness: I had the journal and the ledger. "The Court: What would that tell you about how the stock was held? "The Witness: There was recorded therein in the opening of the corporation the percentage of the holdings of *360 the stockholders. "The Court: As of what date? "The Witness: 1937, sir. "The Court: And how did you know how the stock was held in 1945 or '44? "The Witness: Well, my general knowledge of the handling of the books each year, and my close association with the president of the company, I did not ask him particularly whether or not there had been any change in the ownership, but I feel reasonably sure if there had been, he would have said something to me about it, sir. "The Court: He didn't mention the stock ownership to you at all; is that what you are telling we now? "The Witness: Not that I know of, sir." Nor does the fact that petitioner's operations were handled by a fiduciary alter the necessity of imposing the penalty. Lone Pine Lawn Corp., 41 B.T.A. 638, affirmed (CCA-2), 121 Fed. (2d) 935. We have accordingly concluded that the failure to file the required returns was due not to reasonable cause but to wilful neglect. Decision will be entered for the respondent.